**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **FEDEX CORPORATION,** | ) | |
| **FEDEX CORPORATION** | ) | |
| **EMPLOYEES' PENSION PLAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 08-2827-STA-dkv** |
| | ) | |
| **THE NORTHERN TRUST COMPANY,** | ) | |
| **and NORTHERN TRUST** | ) | |
| **INVESTMENTS, N.A.,** | ) | |
| | ) | |
| **Defendants,** | ) | |

**ORDER DENYING PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIM**

Before the Court is Plaintiffs' Motion to Dismiss Counterclaim (D.E. # 31) filed on August 3, 2009. This matter was transferred for all further proceedings to the undersigned by United States District Judge Bernice B. Donald on August 7, 2009. Defendants have filed a response in opposition to Plaintiff's Motion, and Plaintiffs have filed a reply brief. For the reasons set forth below, Plaintiffs' Motion is **DENIED**.

**<u>BACKGROUND</u>**

Although Defendants have denied the allegations of the Complaint, the Court will set them out here in order to provide a factual background for the case and because Defendants have defined some of the terms in their Counterclaim with reference to the Complaint.[1] In its previous

---

[1] Countercl. n. 2.

1

Order Denying Defendants' Motion to Dismiss Counts Two and Three of the Complaint,[2] the Court summarized the allegations of the Complaint as follows: FedEx Corporation ("FedEx"), a corporation organized under the laws of the state of Delaware with its principal place of business in Memphis, Tennessee, is the administrator of the FedEx Corporation Employees' Pension Plan ("Pension Plan" or "the Plan") as defined in the Employee Retirement Income Security Act of 1974 ("ERISA").  (Compl. ¶¶ 5, 6.)  On approximately May 10, 1982, FedEx entered into a trust agreement with the Northern Trust Company ("NTC"), an Illinois state banking corporation with its principal place of business in Chicago, Illinois.  (*Id.* ¶¶ 7, 11.)  Under the agreement, FedEx established the FedEx Pension Trust as a funding medium for the Pension Plan, and NTC agreed to be the trustee and custodian of the assets of the FedEx Pension Trust.  (*Id.* ¶ 11.)  Under the trust agreement, NTC is a fiduciary with respect to the Pension Plan and has the following duties and responsibilities:

> (1) the powers of the Trustee shall be exercisable for the exclusive purpose of providing benefits to the Participants and Beneficiaries under the Plan and in accordance with the standards of a prudent man under ERISA;
>
> (2) the Trustee shall diversify the investments of the portion of the Trust fund of which it has investment responsibility so as to minimize the risk of large losses;
>
> (3) the Trustee shall, with respect to that portion of the Trust Fund for which it has investment responsibility, follow the investment guidelines established by [FedEx] and shall act in accordance with the direction of [FedEx] given in exercise of [FedEx's] responsibility.

(*Id.* ¶¶ 12, 13.)  The trust agreement also specifies that NTC may lend Pension Plan assets only if it enters into a written agreement with FedEx that allows for securities lending.  (*Id.* ¶ 14.)  The

---

[2] Order Denying Defs.' Mot. Dismiss (Donald, J.), May 20, 2009.

FedEx Corporation Retirement Plan Investment Board ("RPIB") was responsible for selecting investment managers for assets of the Pension Plan, transferring assets among separate accounts, and monitoring investments.  (*Id.* ¶ 15.)

Around May 2003, the RPIB asked NTC whether it had a fixed income index fund in which to invest Pension Plan assets, as the RPIB had just terminated one of the Pension Plan's investment managers.  (*Id.* ¶¶ 16, 17.)  NTC advised the RPIB that it had the Bond Index Fund, which would  meet the RPIB's needs for a safe fixed income index fund and which tracked the Lehman Brothers Long Term Government Bond Index.  (*Id.* ¶ 17.)

Plaintiffs maintain that at the time of this recommendation and throughout the time at issue in this case, NTC was aware that FedEx objected to Pension Plan assets being involved in securities lending and that FedEx repeatedly made this objection clear.  (*Id.* ¶¶ 18, 22, 27.)  FedEx also notes that the RPIB never executed a written securities lending agreement authorizing Pension Plan assets to be loaned out.  (*Id.* ¶ 23.)  With this knowledge, NTC still recommended the Bond Index Fund, which was part of the Northern Trust Quantitative Management Collective Funds Trust ("Collective Trust"), despite the fact that it was engaged in securities lending.  (*Id.* ¶ 18.)  After the RPIB accepted NTC's recommendation on or about May 27, 2003, the RPIB requested that NTC transfer certain Pension Plan assets to the Bond Index Fund.  (*Id.* ¶ 21.)

On or about December 29, 2006, Plaintiffs allege that the RPIB directed NTC to establish a "Separate Investment Account" and invest Pension Plan assets in the Russell Index Fund.  (*Id.* ¶ 24.)  The December 29th letter indicated that the Russell Index Fund could lend securities and appointed NTC as its securities lending agent.  The letter also required NTC to redeem without

penalty all Pension Plan assets from the Russell Index Fund within thirty days notice from the Pension Plan's fiduciaries.  (*Id*. ¶ 25.)  The Russell Index Fund was part of the Collective Trust, and thus Defendant National Trust Investments ("NTI") was the named fiduciary.  (*Id*. ¶ 26)  FedEx alleges that it had no control over the investment process or over the investment decisions of NTI with regard to the Russell Index Fund. (*Id*.)

In making the recommendation of the Russell Index Fund, Plaintiffs contend that NTC represented that it would eliminate inordinately high risk stocks from the fund and that the Russell Index Fund would be re-balanced to minimize expected deviation between performance of the Fund and performance of the Russell 2000 Index.  (*Id*. ¶ 27.)  At no time did NTC discuss with the RPIB the extent of the Russell Index Fund's securities lending. (*Id*.)

In early September 2008, the RPIB decided to change its investment strategy and move away from the Bond Index Fund to a separately managed account.  (*Id*. ¶ 28.)  In approximately mid-September 2008, the RPIB directed NTC to transfer all of the Pension Plan's assets from the Bond Index Fund to the new investment manager's account.  (*Id*. ¶ 29.)  NTC advised FedEx that it could not immediately transfer the assets because over 80% of the Pension Plan's assets in the Bond Index Fund were loaned out to borrowers and that the cash collateral held in return for the securities was held in a pool of securities called the Core USA Fund, which comprised riskier and largely more volatile funds.  (*Id*. ¶ 30.)

NTC informed FedEx that it had to sell the Core USA Fund securities to obtain cash to retrieve the loaned securities. (*Id*. ¶ 31.) The Core USA Fund securities, however, were not worth enough money to generate sufficient cash to recall the loaned securities.  (*Id*.)  NTC, as a result, refused to immediately redeem the full value of the Pension Plan's assets in the Bond

Index Fund.  (*Id*.)  At approximately the same time, NTC informed FedEx that a similar problem

existed with the Russell Index Fund, where 50% of the Pension Trust's assets were loaned out to

borrowers and the cash collateral was held in Core USA Fund securities, which was illiquid due

to the financial crisis.  (*Id*. ¶ 32.)

On approximately September 19, 2008, NTC declared a collateral deficiency in the Core

USA Fund.  (*Id*. ¶ 33.)  To remedy the deficiency, NTC booked a receivable to the Core USA

Fund payable from each investor in the Collective Trust to restore the value of the Core USA

Fund.  NTC reported to FedEx that the Pension Plan's assets lost $1 million in the Russell Index

Fund and $8 million in the Bond Index Fund.  (*Id*. ¶ 34.)

After learning of these problems and deficiencies, FedEx alleges that it demanded a

complete withdraw of Pension Plan assets by NTC and NTI from both the Russell Index Fund

and the Bond Index Fund.  (*Id*. ¶ 36.)  In early October 2008, Defendants offered as a

compromise to FedEx's demand for a complete withdrawal to fully redeem in cash or in kind all

of the Pension Plan's assets from the Bond Index Fund in eight installments over an eight-day

period beginning in October 15, 2008.  (*Id*. ¶ 37, 55.)  FedEx accepted Defendants' offer. (*Id*.)

Defendants and FedEx also reached a compromise that Defendants would fully redeem in cash

or  in kind all of the Pension Plan's assets from the Russell Fund Index in four installments over

a four-day period beginning on October 27, 2008.  (*Id*. ¶ 38, 56.)

To process the withdrawal, NTC prepared a direction letter for FedEx to sign and send

back to NTC.  (*Id*. ¶ 39.)  On or about October 3, 2008, FedEx sent the signed direction letter to

NTC instructing it to make the eight redemptions from the Bond Index Fund. (Id.)  NTC

acknowledged receipt and agreed to proceed.  (*Id*.)  On October 14, 2008, Defendants contacted

FedEx and advised that they would not redeem the Pension Plan's assets.  (*Id.* ¶ 40, 57.)  NTC offered an alternative option, which FedEx deemed unacceptable. (*Id.* ¶¶ 40-42.)

FedEx claims that based on these actions, Defendants have breached their fiduciary duties to the Pension Plan under ERISA.  (*Id.* ¶¶ 43-52.)  FedEx alleges that the Pension Plan is entitled to relief under the federal common law of contracts for Defendants' failure to honor the compromise agreements to repay the Pension Plan's assets.  (*Id.* ¶¶ 53-58.)  FedEx also claims that it is entitled to relief for Defendants' breach of the compromise agreements under Tennessee state common law. (*Id.* ¶¶ 59-65.)

In their Counterclaim, Defendants' have alleged the following against Plaintiff FedEx and Counterclaim-defendant FedEx Corporation RPIB: FedEx created and maintains the Plan for the benefit of its employees, retirees, and their beneficiaries.  (Countercl. ¶ 3.)  FedEx is the Administrator of the Plan and the named Fiduciary of the Plan for Plan administration and Plan investments.  (*Id.* ¶¶ 4-5.)  FedEx has overall authority and control over the investment of Plan assets (also known as the "Trust Fund"), which it exercises largely through the activities of the RPIB.  (*Id.* ¶ 6.)  FedEx maintains the RPIB and appoints its members.  (*Id.* ¶ 7.)  All members of the RPIB are officers and/or employees of FedEx.  (*Id.*)  The RPIB is ultimately responsible for allocating Plan assets among "Separate Accounts" and for selecting Investment Managers or Investment Fiduciaries for those accounts.  (*Id.* ¶ 8.)  The RPIB's overall authority and control over the investment of Plan assets also requires the RPIB to determine appropriate investment guidelines and limitations applicable to each such Investment Manager and Fiduciary and to monitor the continued appropriateness of the allocation of Plan assets among such Investment Managers and Investment Fiduciaries in light of the current needs of the Plan.  (*Id.*)  The RPIB

6

has investment responsibility for any assets of the Plan not otherwise allocated to a Separate

Account and for assets held in any Separate Account for which an Investment Manager or an

Investment Fiduciary has not been retained, has been removed, or is for any reason unwilling or

unable to act.  (*Id*. ¶ 9.)  The RPIB also has the discretion to name itself as the Investment

Manager or Investment Fiduciary of any Separate Account.  (*Id*.)  The RPIB is also responsible

for monitoring the investments of the Plan, including the diversification of Plan assets, the risks

posed by the investments, and the performance of the investments.  (*Id*. ¶ 10.)

Defendants allege that NTC is the directed Trustee of the Plan.  (*Id*. ¶ 11.)  Under

ERISA, a person is a fiduciary only to the extent that the person has fiduciary authority pursuant

to ERISA § 3(21), 29 U.S.C. §1002(21).  (*Id*. ¶ 12.)  With respect to the investment of Plan

assets, NTC was required to act at the direction of the RPIB and any duly-appointed Investment

Managers or Investment Fiduciaries.  (*Id*. ¶ 13.)  NTC did not have any discretionary investment

authority or responsibility with respect to any investment of Plan assets.  (*Id*.)  The Pension Trust

Agreement stated, in part, that NTC "shall not make any investment review of, consider the

propriety of holding or selling, or vote other than as directed by the Investment Manager or

Investment Fiduciary, any assets of the Trust Fund allocated to a Separate Investment Account."

(*Id*.)  NTC did not have any authority or responsibility to provide advice to FedEx or the RPIB

regarding the investment of Plan assets.  (*Id*. ¶ 14.)  NTC did not have any authority or

responsibility to make any investment review of, or to consider the propriety of holding or

selling, any assets of the Plan, except as related to the short term investment of cash, absent

contrary instruction from the Investment Manager or Investment Fiduciary thereof.  (*Id*. ¶ 15.)

NTC was not an investment fiduciary with respect to the Plan.  (*Id*. ¶ 16.)

7

Since at least June 1995, FedEx—through the RPIB—has authorized and directed NTC to invest a portion of the Plan assets in collective funds that engage in securities lending.  (*Id*. ¶ 17.)  NTC was authorized by § 4.1(c) and § 4.3 of the Pension Trust Agreement to follow the directions of the RPIB to cause any part or all of the Plan assets to be commingled or collectively invested with the assets of trusts created by others by causing the Plan assets to be invested as part of the funds created by any such commingled or collective or group trusts.  (*Id*. ¶ 18.)  Defendants have included a table which lists the securities lending collective funds managed by NTI ("Lending Index Funds") in which FedEx, through the RPIB, has invested some portion of the Plan assets since 1995.  (*Id*. ¶ 19.)  In addition, Defendants allege that on information and belief, that FedEx, through the RPIB, has authorized and directed the investment of Plan assets in securities lending collective funds that were not managed by NTI.  (*Id*. ¶ 20.)

Each of the Lending Index Funds is a "collective fund" in which dozens or even hundreds of other employee and retiree pension and savings plans (many established under ERISA), among other investors, invest in each of the Lending Index Funds.  (*Id*. ¶ 21.)  Each of such funds is a "Collective Fund" that is governed by the Amendment and Restatement of Declaration of Trust of the Northern Trust Global Investments Quantitative Management Collective Funds Trust, dated January 31, 2006 ("Declaration of Trust"), pursuant to which NTI is the trustee of each such Collective Fund.  (*Id*.)  Among other things, such investors are bound by the Declaration of Trust as a condition of their investment.  (*Id*.)  Provisions of the Declaration of Trust control and supersede any contrary or inconsistent provisions in the Pension Trust Agreement.  (*Id*.)

The Pension Trust Agreement also expressly incorporates the terms and conditions of

the Declaration of Trust and provides that the terms of the Declaration of Trust shall prevail over any contrary provision of the Pension Trust Agreement.  (*Id*. ¶ 22.)  Participating Trusts do not own any of the individual securities held by the Lending Index Funds or any other fund included within the Collective Funds Trust.  (*Id*. ¶ 23.)  Instead they own undivided interests in any fund in which they have invested.  (*Id*.)  These interests are called "Units."  (*Id*.)  FedEx invested in, and the Plan assets include, "Units" in the Lending Index Funds.  (*Id*.)  Participating Trusts in any of the funds included within the Collective Funds Trust must share fund gains and losses proportionately with the other Participating Trusts that have invested in the same funds.  (*Id*. ¶ 24.)  NTI's duties as trustee include treating Participating Trusts in any of the Lending Index Funds equitably and impartially.  (*Id*. ¶ 25.)

At all times relevant to the Counterclaim, the RPIB knew and should have known, among other things, that (i) the Lending Index Funds were collective funds governed by the Declaration of Trust; and (ii) the funds could and did engage in securities lending.  (*Id*. ¶ 26.) The RPIB also knew and should have known that these Lending Index Funds would lend their securities to borrowers and receive certain collateral from the borrowers in return, and that cash collateral so received would be invested in fixed-income securities.  (*Id*.)  The RPIB further knew that securities lending, including such investment of cash collateral, carried risks.  (*Id*.) Notwithstanding their knowledge that securities lending carried risks, the RPIB selected the Lending Index Funds for investment of Plan assets.  (*Id*.)

FedEx and the RPIB were provided with copies of the Declaration of Trust and the "Fund Declarations" governing each Lending Index Fund in which FedEx invested assets of the Plan.  (*Id*. ¶ 27.)  Each Fund Declaration provided a written description of the fund that

disclosed, among other things, that: (i) the fund was authorized to engage in securities lending; (ii) NTC, an affiliate of NTI, was the securities lending agent for the fund; (iii) the lending agent would receive compensation equal to 40% of the net securities lending revenue earned by the fund; and (iv) cash collateral provided by borrowers would be invested at NTI's discretion, including in other funds managed by NTI or affiliated companies.  (*Id*.)

At the time it authorized and directed each initial and subsequent investment in the Lending Index Funds, the RPIB knew that neither the Declaration of Trust nor the Fund Declarations imposed caps on the percentage of Lending Index Fund securities that could be lent.  (*Id*. ¶ 28.)  The RPIB knew that none of these documents capped the amount of Lending Index Fund securities that could be lent.  (*Id*.)  The RPIB thus authorized up to 100% of the Lending Index Fund assets to participate in securities lending.  (*Id*.) At the time it authorized and directed each initial and subsequent investment in the Lending Index Funds, the RPIB knew that cash collateral received from borrowers was invested in other investment options managed by NTI or its affiliates, such as the Core USA collateral pool.  (*Id*. ¶ 29.)

Over the period in which FedEx and the RPIB invested Plan assets in the Lending Index Funds, they received a variety of reports and other information that disclosed that the funds were engaged in securities lending, the amount of securities on loan, and the nature of the securities in which collateral for loaned securities was invested.  (*Id*. ¶ 30.)  Among the reports and information received by FedEx and the RPIB were annual reports for the Lending Index Funds. (*Id*. ¶ 31.)  These annual reports were provided in accordance with §103 of ERISA, which requires financial institutions that hold assets of a plan in a collective trust to provide the plan with an annual statement of the collective trust's assets and liabilities.  (*Id*.)  The information

provided in the annual reports received by FedEx and the RPIB for the years in which they

invested Plan assets in the Long-Term Bond Index Lending Fund and the Russell 2000 Index

Lending Fund included, among other things, the following information and data about the

amount of lending in each fund (all numbers in '000s except percentages):

(i) Long-Term Bond Index Lending Fund

| Year | Net Asset Value | Value of Securities on Loan | Percentage of Securities on Loan With Respect to Net Assets |
|------|-----------------|------------------------------|--------------------------------------------------------------|
| 2002 | 396,679 | 316,828 | 79.87 |
| 2003 | 659,230 | 479,700 | 72.77 |
| 2004 | 1,611,727 | 1,276,924 | 79.23 |
| 2005 | 1,820,027 | 1,501,138 | 82.48 |
| 2006 | 1,723,688 | 1,540,406 | 89.37 |
| 2007 | 2,296,454 | 2,084,919 | 90.79 |
| 2008 | 2,342,395 | 2,006,869 | 85.68 |

(*Id.* ¶ 32.)

(ii) Russell 2000 Index Lending Fund

| Year | Net Asset Value | Value of Securities on Loan | Percentage of Securities on Loan With Respect to Net Assets |
|------|-----------------|------------------------------|--------------------------------------------------------------|
| 2007 | 8,857,745 | 3,074,471 | 34.71 |
| 2008 | 8,188,519 | 2,491,184 | 30.42 |

(*Id.*)

Defendants allege that in exercising their authority as the Plan Administrator and the Investment Fiduciary, respectively, FedEx and the RPIB were each required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  (*Id.* ¶ 33.)  This duty applied to FedEx's and the RPIB's acts in, among other things, (i) directing NTI on how to invest plan assets, and (ii) monitoring the continuing appropriateness of those investments.  (*Id.*)

With respect to the investments in the Lending Index Funds, FedEx and the RPIB were therefore required to give appropriate consideration to such facts and circumstances as the risk of loss and the opportunity for gain; the diversification of the Plan's investments, the liquidity and current return of each Separate Account relative to the anticipated cash flow requirements of the Plan as a whole; and the projected return of the Plan Fund investments relative to the funding objectives of the Plan.  (*Id.* ¶ 34.)  The duties owed to the Plan by FedEx and the RPIB included, without limitation, a responsibility to understand and assess, among other things, the structure, risks, and costs of the securities lending component of each Lending Index Fund, both when they directed NTC to invest in such Lending Index Fund pursuant to the investment guidelines and on an ongoing basis thereafter, in order to ensure that the investments were in compliance with the terms of the Plan, the Pension Trust Agreement, and applicable statutory standards.  (*Id.* ¶ 35.)  To fulfill the foregoing functions, FedEx and the RPIB are required to obtain, consider, and maintain the requisite expertise, knowledge, and information to understand and evaluate the nature of the risks, costs, and potential returns of the investments

that they authorize and direct on behalf of the Plan, including investments in Collective Funds that engage in securities lending.  (*Id*. ¶ 36.)

In this case, Plaintiffs allege that the acts and omissions of NTI and NTC violated fiduciary duties that NTC and NTI owed to the Plan.  (*Id*. ¶ 37.)  NTC and NTI deny all such allegations, but if those allegations were established, in whole or in part, then Defendants allege that FedEx and the RPIB would be wholly liable for any injuries and damages to the Plan, because as Plan Administrator and Investment Fiduciary with respect to the investments in the Collective Funds, FedEx and the RPIB were substantially more at fault than were NTI and NTC for any such injuries and damages.  (*Id*.)

For example, in this case, Plaintiffs allege that the RPIB did not authorize NTC to lend assets of the Plan.  (*Id*. ¶ 38.)  That allegation is immaterial, since NTC did not lend any assets of the Plan, and it mis-characterizes the loan of assets of the Long-Term Government Bond Fund and the Russell 2000 Fund to the loan of Plan assets by NTC.  (*Id*.)  But even if the allegation were not deficient, and were true, the failure of FedEx and the RPIB to understand that the investment vehicles in which they authorized and directed NTC to invest Plan assets were securities lending funds, and that the funds engaged in securities lending, would constitute a primary and active breach of trust and fiduciary duty by FedEx and the RPIB such that it would be substantially more at fault than NTI or NTC for any alleged injury arising from the investments.  (*Id*.)  Such a failure by FedEx and the RPIB would amount to inadequate due diligence and investigation at the time of making the investment and thereafter, and would constitute a failure to administer the trust investments diligently and prudently, and for that reason, among others, would violate the duties of FedEx and the RPIB under ERISA.  (*Id*.)

In any event, FedEx and the RPIB knew, and should have known, among other things, that the Lending Index Funds participated actively in securities lending, that there were no caps on lending by the Lending Index Funds, that the Lending Index Funds invested cash collateral in a variety of fixed-income assets held in Core USA, and that the investment of cash collateral, like any other investment, carried the risk of investment losses. (*Id.* ¶ 39.) Accordingly, if those investments are found to be in violation of the Trust Agreement or any duty owed by either NTC or NTI to the Plan, which NTC and NTI deny, then FedEx and the RPIB actively (i) engaged and participated in; (ii) approved, ratified, acquiesced in, or concealed; (iii) neglected to take proper steps to redress; or (iv) enabled NTC and NTI to commit, that alleged breach or imprudence, such that FedEx and the RPIB are substantially more at fault than NTC and NTI for any injury or damage arising from the investments. (*Id.*)

To the extent that the Plan has suffered losses as a result of investing in the Lending Index Funds—which NTC and NTI deny—any such losses have been directly caused by the failure of FedEx and the RPIB to act diligently and prudently in directing NTC to invest in the Lending Index Funds and in monitoring those investments, in violation of their fiduciary obligations under ERISA. (*Id.* ¶ 40.) None of such losses were caused by any failure by NTC or NTI to notify or disclose to FedEx or the RPIB information about (i) the Lending Index Funds; (ii) such funds' securities lending activities or securities lending generally; or (iii) the risks of securities lending by such funds or generally. (*Id.*) Nor were any such losses caused by any lack of knowledge about such issues by FedEx or the RPIB or by any wrongful conduct by NTC or NTI. (*Id.*) At all relevant times, FedEx and the RPIB were aware of the information that they claim should have been disclosed to them by NTC or NTI, and nevertheless made and

14

maintained the investments about which they complain in this case.  (*Id.*)

In Count I of their Counterclaim, Defendants seek indemnity for any liability they may have in this case.  Although NTC and NTI deny any liability with respect to the matters alleged by Plaintiffs in their Complaint and further deny that the actions or omissions alleged against them by Plaintiffs constitute violations of law, contract, or fiduciary duties under ERISA, or caused any injuries or damages to the Plan, if NTC and NTI are found liable to the Plan on any claim, it will be due to the wrongful acts or omissions of FedEx and the RPIB as alleged in the Counterclaim.  (*Id.* ¶ 42.)

Furthermore, under Section 9.6 of the Pension Trust Agreement, FedEx agreed to indemnify NTC "against any loss or liability, including reasonable legal fees and expenses, incurred by the Trustee [NTC] solely as a result of (i) the making, retention or disposition by an Investment Manager, the Committee [the RPIB] or an Investment Fiduciary of any investment of the Trust Fund under the management and control of such Investment Manager, Committee or Investment Fiduciary; or (ii) following the direction of an Investment Manager, the Committee or an Investment Fiduciary in connection with the investment of any such asset of the Trust Fund or failing to take an action with respect to any such asset of the Trust Fund in the absence of such direction." (*Id.* ¶ 43.)  To the extent Plaintiffs prevail on some or all of their claims against NTC and NTI, any alleged injuries or damages suffered by the Plan were caused completely and substantially by the acts and omissions of FedEx and the RPIB, as alleged in the Counterclaim. (*Id.* ¶ 44.)  NTC is entitled to contractual indemnification from FedEx for all such injuries and damages for which NTC may be held liable, including reasonable legal fees and expenses.  (*Id.* ¶ 45.)  Further, NTI and NTC are each entitled to equitable and implied indemnification from

FedEx and the RPIB, which are the Named Fiduciary and Investment Fiduciary of the Plan, respectively, for all such injuries and damages for which NTI and/or NTC may be found to be liable because NTC and NTI have only a secondary, derivative, or vicarious liability, and FedEx and the RPIB have substantially more responsibility, for any such injuries or damages. (*Id.* ¶ 46.) By their acts and omissions described above, FedEx and the RPIB are also responsible for expenses, including attorney's fees and costs, incurred by NTC and NTI in litigating this action. (*Id.* ¶ 47.)

In Count II of their Counterclaim, Defendants also seek contribution to the extent Plaintiffs prevail on some or all of their claims against them. Defendants allege that they are entitled to contribution from Plaintiffs under ERISA, and under federal ERISA common law, for Plaintiffs' proportionate responsibility for the injuries and damages allegedly suffered by the Plan, because any such injuries and damages were caused partially or wholly by the wrongful acts and omissions of Plaintiffs, which are the Named Fiduciary and Investment Fiduciary of the Plan, as set forth above. (*Id.* ¶ 50.) Absent contribution, NTC and NTI will or may discharge more than their proportionate share of alleged liability (if any) to the Plan, which liability is either secondary or, at most, in common with the liability of FedEx and the RPIB. (*Id.*)

In its Motion to Dismiss, Plaintiffs argue that the Court should dismiss Defendants' counterclaims for indemnity and contribution. The Pension Trust Agreement between Plaintiff Fed Ex and Defendant NTC does not provide for contractual indemnification for NTC's conduct as an investment fiduciary. Plaintiffs contend that NTC is entitled to contractual indemnification for loss or liability arising from NTC's conduct as a "directed trustee." According to Plaintiffs, NTC "stepped outside of its role as directed trustee when it provided specific investment

recommendations to FedEx." Plaintiffs argue that NTC acted as a fiduciary and had fiduciary duties to FedEx. The contractual indemnity provisions therefore do not apply to any acts undertaken by NTC in this fiduciary capacity.

Additionally, Plaintiffs argue that the Sixth Circuit has not recognized a right of contribution or indemnity among co-fiduciaries under ERISA or federal common law. FedEx relies on *May v. Nat'l Bank of Commerce*, 390 F. Supp. 2d 674, 677 (W.D. Tenn. 2004), (McCalla, J.), a decision in which the Court dismissed a counterclaim for contribution and indemnity pursuant to ERISA. Although the Sixth Circuit has never addressed the issue, this Court's decision in *May* was consistent with rulings from other district courts in the Sixth Circuit which have considered the question.[3] Similarly, Plaintiffs contend that there is no implied right to contribution or indemnity in federal common law. For these reasons, the counterclaims should be dismissed.

In opposition to the Motion to Dismiss, Defendants argue that as an initial matter, the Court must focus its Rule 12(b)(6) on the allegations of the Counterclaim, not the Complaint. Therefore, the allegations of the Complaint are irrelevant to the counterclaim for contractual indemnification. Plaintiffs' allegations to the contrary, Defendants have alleged in the Counterclaim that NTC was not an investment fiduciary owing any fiduciary duty to the Plan. Even if the Court accepted the allegations of the Complaint as true, Defendants' Counterclaim for indemnity should survive the Motion because the Complaint never alleges that NTC was an investment advice fiduciary. Next Defendants argue that ERISA permits contribution and

---

[3] Plaintiffs/Counter-defendants go on to cite decisions from the Eighth and Ninth Circuits consistent with the rule adopted by the Court in *May* and by other district courts in this Circuit.

17

indemnification between fiduciaries pursuant to federal common law, and by analogy from the law of trusts.  The Sixth Circuit has recognized the role of developing common law gap-filling terms where ERISA is silent.  As a starting point for interpretation of ERISA, the Sixth Circuit has turned to the law of trusts, which does recognize the right of contribution among co-trustees.  Defendants contend that courts have construed ERISA to permit equitable remedies in particular even if such a remedy is not expressly identified in ERISA.  Defendants distinguish the *May* decision by stating that the parties and the Court did not consider the common law of trusts as the starting point for considering what remedies ERISA does provide.

In their reply brief, Plaintiffs argue that the allegations of the Complaint are relevant to the analysis here because Plaintiffs have alleged that NTC was an investment advice fiduciary.  Thus, the contractual indemnification provided in the Trust Agreement for NTC in its capacity as directed trustee does not apply in this case.  Plaintiffs repeat their contention that the cases declining to infer from ERISA a right to contribution and indemnity control this case.

## **STANDARD OF REVIEW**

A party may move to dismiss a claim or counterclaim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the counterclaim as true and construe all of the allegations in the light most favorable to the non-moving party.[4]  However, legal conclusions or unwarranted factual inferences need not be

---

[4] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992).

accepted as true.[5]  "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[6]  "The Federal Rules of Civil Procedure do not require a claimant to set out in detail all the facts upon which he bases his claim."[7]  The Federal Rules "do not require a heightened fact pleading of specifics, but only enough facts to state a claim that is plausible on its face."[8]  The plausibility standard ensures that "a district court... retain[s] the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."[9]  In this way, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court."[10]

In short, on a motion to dismiss, the Court must construe the pleading in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the

---

[5] *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

[6] *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).  *See also United Ass'n of Journeymen & Apprentices of the Plumbing and Pipefitting Indus., Local 577 v. Ross Bros. Constr. Co.*, 191 F.3d 714, 716 (6th Cir. 1999) (analyzing sufficiency of counterclaim under Rule 12(b)(6)).

[7] *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

[8] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) ("retiring" the "no set of facts" standard first announced in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).  *See also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[9] *Twombly*, 127 S. Ct. at 1967 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

[10] *Twombly*, 127 S. Ct. at 1966 (citations omitted).

complaint contains "enough facts to state a claim to relief that is plausible on its face."[11]  Thus, although the factual allegations in a complaint need not be detailed, they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief."[12]

## ANALYSIS

As an initial matter, the Court must determine whether Defendants have stated their counterclaims for indemnity and contribution by assessing the sufficiency of the Counterclaim alone.  Although some of the terms used in the Counterclaim are defined with reference to the Complaint, the Court need not accept the factual allegations of the Complaint as true.  At the same time, the Court must accept the well-pled allegations of the Counterclaim as true for purposes of this Motion.

In light of this standard, the Court holds that Defendants have stated Count I of their Counterclaim for contractual indemnity.  The Counterclaim asserts that Section 9.6 of the Pension Trust Agreement provides that FedEx will indemnify NTC

> against any loss or liability, including reasonable legal fees and expenses, incurred by the Trustee [NTC] solely as a result of (i) the making, retention or disposition by an Investment Manager, the Committee [the RPIB] or an Investment Fiduciary of any investment of the Trust Fund under the management and control of such Investment Manager, Committee or Investment Fiduciary; or (ii) following the direction of an Investment Manager, the Committee or an Investment Fiduciary in connection with the investment of any such asset of the Trust Fund or failing to take an action with respect to any such asset of the Trust Fund in the absence of such direction.

---

[11] *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Twombly,* 127 S.Ct. at 1974).

[12] *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly,* 127 S.Ct. at 1964-65).

The Counterclaim further alleges that any injuries or damages suffered by the Plan were caused in their entirety by the acts and omissions of FedEx and the RPIB.  Per the terms of the contractual indemnity provision, Defendants have alleged that they are entitled to indemnification from FedEx for all injuries and damages for which NTC may be held liable, including reasonable legal fees and expenses.

The issue presented then is whether Defendants have sufficiently pled in the Counterclaim that the Pension Trust Agreement's indemnification term should apply.  The Court notes that the interpretation of a contract provision, including an indemnity provision, typically presents a question of state law.[13]  In this case neither party has identified which state's law governs the Pension Trust Agreement, the contract between the parties governing indemnification.  The Court need not resolve this issue because there is no dispute about the validity of the contract or the plain meaning of its indemnification term.  Rather, Plaintiffs contend that Defendant NTC exceeded the scope of its authority as directed trustee and acted as an investment fiduciary as ERISA defines that term.  Plaintiffs argue then that Defendants have no right to indemnification because the conduct of NTC falls outside of the scope of the contractual indemnity provision.  The Court finds Plaintiffs' legal conclusions about Defendants' fiduciary status largely irrelevant on a Rule 12(b)(6) motion to dismiss the counterclaim.  In the ERISA context, the Sixth Circuit has held that "[a] party does not become a fiduciary simply by

---

[13] *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 474, 109 S.Ct. 1248 (1989) ("interpretation of private contracts is ordinarily a question of state law"); *Kipin Indus., Inc., v. Van Deilen Intern., Inc.*, 182 F.3d 490 (6th Cir. 1999).

a litigant's assertion that this is the case."[14]  Furthermore, the allegations of the Complaint do not control where the Court is testing the sufficiency of the Counterclaim.  Accordingly, the Court must confine its analysis to the well-pled allegations of Defendants' Counterclaim.

Pursuant to the Rule 12(b)(6) standard of review, the Court must accept the following factual allegations of the Counterclaim as true: NTC is the directed trustee of the Plan, meaning that NTC invested Plan assets at the direction of the RPIB.  NTC did not have any discretionary investment authority or responsibility for the investment of Plan assets.  For example, NTC has alleged that the Pension Trust Agreement stated that NTC "shall not make any investment review of, consider the propriety of holding or selling, or vote other than as directed by the Investment Manager or Investment Fiduciary, any assets of the Trust Fund allocated to a Separate Investment Account."[15]  Furthermore, the Counterclaim alleges that NTC did not have any authority or responsibility to provide advice to FedEx or the RPIB regarding the investment of Plan assets.  NTC did not have any authority or responsibility to make any investment review of, or to consider the propriety of holding or selling, any assets of the Plan, except as related to the short term investment of cash, absent contrary instruction from the Investment Manager or Investment Fiduciary thereof.

While the Counterclaim goes on to allege that NTC did not act as an investment fiduciary

---

[14] *Akers v. Palmer*, 71 F.3d 226, 230 (6th Cir. 1995).

[15] Although the Court would have authority to examine any document referred to in a pleading and submitted as an exhibit pursuant Rule 10(c), neither party has submitted the Pension Trust Agreement or any other document referred to the Counterclaim.  Pursuant to Rule 12(b)(6), the Court's analysis is limited to the well-pled allegations of the Counterclaim. Therefore, the Court accepts NTC's recitation of the terms of the Pension Trust Agreement as true and accurate.

for the Plan, the Court finds that this is the type of legal conclusion that it need not accept as true under Rule 12(b)(6).[16]  A party's status as an ERISA fiduciary is purely a question of law as long as the facts are not in dispute.[17]  The Court finds that the facts are not in dispute here because the Court must accept the well-pled factual allegations as true on a motion to dismiss the pleading.[18]  Thus, for purposes of this Motion, NTC's status as an ERISA investment fiduciary is purely a question of law for the Court.

Based on the factual allegations of the Counterclaim, the Court holds that NTC has adequately pled in the Counterclaim that it acted in its capacity as a directed trustee and was not an investment fiduciary.  Therefore, NTC's conduct did not fall outside the terms of the indemnity provision, and Defendants have stated a claim for indemnification per the Pension Trust Agreement.  Under ERISA, a party may act as a fiduciary to the extent the party "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so."[19]  A person is "deemed to be rendering 'investment advice' to an employee benefit plan, within the meaning of [this ERISA] section. . . only if:"

> (c)(1)(i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and

---

[16] Unlike the factual allegations of the Counterclaim, legal conclusions need not be accepted as true.  *Twombly,* 127 S.Ct. at 1974.

[17] *Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir. 2001) (citations omitted).

[18] *Morgan*, 829 F.2d at 12.

[19] 29 U.S.C. § 1002(21)(A).

23

    (ii) Such person either directly or indirectly (e.g., through or together with any affiliate)

        (A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

        (B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular

        basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.[20]

Based on this definition and accepting the well-pled factual allegations of the Counterclaim as true, the Court holds that Defendant NTC was not a fiduciary rendering investment advice.  First, for purposes of this Motion, the Court must accept that NTC did not have any discretionary investment authority or responsibility for the investment of Plan assets.  According to 29 C.F.R. § 2510.3-21(c)(1)(ii)(A), an investment fiduciary must have discretion to purchase or sell securities or other property for the plan.  This allegation alone would demonstrate that Defendant NTC was not an investment fiduciary as defined by ERISA.  Additionally, NTC has alleged that it did not have any authority or responsibility to provide advice to FedEx or the RPIB regarding the investment of Plan assets.  The regulation at 29 C.F.R. § 2510.3-21(c)(1)(i) and at (ii)(B) specifically provides that an investment fiduciary is one who renders advice to the Plan about investments and further that such advise is the Plan's "primary basis for investment decisions." Based on the factual allegations set forth in the Counterclaim and for purposes of Defendants'

---

[20] 29 C.F.R. § 2510.3-21(c)(1).

counterclaim for contractual indemnification, the Court holds that Defendant NTC was not an investment fiduciary as ERISA defines that term.

The Court finds no merit to Plaintiffs' argument about NTC's status as an investment fiduciary. Plaintiffs have offered no other basis to conclude that Defendants have failed to state their counterclaim for contractual indemnification. Therefore, Plaintiffs' Motion to Dismiss is **DENIED** as to Count I of Defendants' Counterclaim for indemnification.

**CONCLUSION**

Defendants have stated their counterclaim for indemnity under the Pension Trust Agreement. Having held that Defendants have properly stated their counterclaim for contractual indemnification, the Court declines to reach the other issue raised in Plaintiffs' Motion to Dismiss, namely, whether federal common law provides for indemnity and contribution among ERISA co-fiduciaries. Plaintiffs' Motion to Dismiss the Counterclaim is **DENIED**.

**IT IS SO ORDERED**.

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: January 25th, 2010.